My name is Lannis Temple. I represent Kevin Simpkin, the appellant in this matter. This is an appeal from a 12B6 dismissal from the district court of Kevin Simpkin's complaint. After that dismissal, we did file a motion to stay, which the motions panel in the Ninth Circuit did grant on February 15th, and that's why we're on this expedited appeal before us. Counsel, I had trouble understanding a couple of things in your case. One thing I had trouble with was, I'm not sure I got this right, but I thought he was offered a deal that did not have an arbitration agreement, and it was less money, and he turned it down, and then he took a deal where he would get more money, but there was an arbitration agreement. Do I have that correct? No, Your Honor. There was, after the arbitration agreement and the second offer letter was presented to him, there was an e-mail purporting to offer that he could sign the first offer letter. Had there been a first offer? There was a first offer letter. It had no arbitration agreement? That's correct. And it had more money? It had more money, yes, than the second offer letter, because there was a January 2003 e-mail which guaranteed him the full 8 percent if a strategic partner was brought in. He brought in more money and less money. It's kind of complicated to say because of the formula, but there was a first offer without an arbitration agreement.  And Simpkin turned it down. No, he accepted it. Genesis signed that offer letter. He accepted it verbally, and they performed. He made other work a priority, and he should have signed it, but he never signed it. Simpkin never signed the first offer? We're not sure, Your Honor. He believes he actually faxed the letter back with a signature, but we've never found that. But he performed on that? He performed under it, so it wasn't a forcible agreement. And then he performed extraordinarily well. He was told not to bring any corporate partners, not to spend any time with them, especially Company X, because they had already turned the deal down. He went and talked to Company X, got a tremendous deal where the venture capital's equity was eliminated. They got tens of millions of dollars more in profit. And then he was presented with the second offer letter after performing extremely well with this arbitration agreement, which he complained about and was told it was not negotiable. There is a fair amount of written exchange between your client and GMC, isn't there? That's correct. And that sort of thing. That's correct, Your Honor. Any of them mention this? The first e-mail he sent at ---- They start with a yes or a no. Yes. They do? Yes. There is written communication between your client and GMC that discusses arbitration? In a sense, Your Honor. In what sense? On May 27th, in his first reply, he said, I've redlined everything I want to discuss, because when he was sent the second offer letter, the new parts weren't redlined. So he redlined the new parts, what he wanted to discuss, and sent that e-mail with the second offer letter underlined and what he wanted to discuss. The arbitration agreement was underlined. So that is the e-mail where he says, let's discuss the arbitration agreement. They then discussed by phone the arbitration agreement after he said, I want to discuss this. Another thing that I had trouble with with your case was taking the body of law for contracts of adhesion and applying it to an individually negotiated contract. This fellow was making a deal to be a CEO of a company, a high-paid CEO, individually negotiated deal. Yes. We're taking a body of law that's used for baggage tickets and printed forms that nobody reads and nobody really has any choice over and applying it as though this was just a boilerplate big corporation anonymous individual case. I don't get that. I'm not aware that a contract of adhesion law has ever been applied in a case like this. Well, there were three California cases dealing with an arbitration agreement in an offer letter, and that's Sterlin, McManus, and Abramson, and all of them find that it's procedurally unconscionable, all three. Now, they did state procedurally unconscionable because they looked focused on the arbitration agreement as opposed to the offer letter in general, and they said the arbitration agreement was not subject to negotiation. The employer did not provide notice and a meaningful choice with regards to the arbitration agreement. As I understand what you said just a moment ago, they did, in fact, negotiate the arbitration agreement. He said he didn't want it. And they said it. And they said no. Right. It's got to be there. Now, are you saying that any term in an agreement is unconscionable if the company is unwilling to yield? No. That's not what the company can ever insist on any term? No. As to the arbitration agreement, the Ninth Circuit says on the California cases that you must provide notice of the opportunity to opt out and you must provide a meaningful choice to opt out of the arbitration agreement. Well, he could have said, I really don't care to be your CEO on those terms. Well, he did, and he said it's not negotiable. I mean, what else can he do? Well, let me ask you about the second document, though. Because they told him he couldn't sign the first one or will have to part ways now. His only choice was to sign the second document. Or to part ways. And he just brought in a deal that made his stock worth millions of dollars, and if he left then his stock arguably wouldn't be invested and he would lose millions of dollars. His choice was to sign this or lose millions of dollars. My guess is that all of us in practice walked away from clients where we just chose not to represent them on the terms they preferred. Well, the unconscionability is to give the man the choice to walk away from millions of dollars or to sign the second offer letter. That's unconscionable. Is there anything in the written correspondence that says that? He says, I'm signing this, but I really don't want to sign it. I really want this arbitration agreement. It's critical to me. Well, he did send two e-mails on May 27th and June 13th that objected to all of the non-equity clauses. And then Genesis knew he was upset, so they sent him an e-mail with a July 5th deadline to sign it. Why would you send somebody a deadline, a short deadline to your CEO to sign it unless they knew he was objecting by phone? I object. I object. I object. And I guess I'm still mulling over your previous answer. Why is it unconscionable to give somebody the opportunity to have millions of dollars in exchange for a contract term they don't necessarily like? Why isn't that just outstanding consideration for something that they're not really wild about? I mean, I would grudgingly accept a contract with some not perfect terms if someone gave me millions of dollars, which is what you just said. Why would he walk away from that? Why is that unconscionable? Because the case law says you must be given notice and a meaningful choice. And he wasn't given notice that he could opt out, and he wasn't given a meaningful choice. Let me ask just about this. Tell me what to make of this time sequence and if I'm wrong about the dates. My understanding is that on June 17, Simkin mailed to, is it Manalou?  Manalou, offering for further negotiations, thanking him for getting the deal done so quickly. The letter says nothing about the lack of an arbitration clause. On June 24, Manalou emails back that he's incorporated Skim Skim Skim's proposed changes. And the next day, your client says, send me the document to sign. That wasn't the start of the negotiations. The second offer letter was sent to him on May 23. On May 27 is when he sent the email objecting to the arbitration clause. And it was shortly after that they said it wasn't negotiable. In that email, he also wanted to include other clauses, and those were turned down. And we need to make clear this wasn't a full and free negotiation. He had asked for several things. For instance, they wanted him to sign a release in order to receive his severance. He asked for that to be deleted. It was denied. There was a January 23 email agreement in which the full 8 percent would be guaranteed upon the strategic partnership, which meant they couldn't fire him and then take his stock. That was denied. I don't get it. You're saying either the contract is his way or it's unconscionable, so it's unenforceable. No, it was all Genesis' way. Every person who plays a character in a movie, once the movie is halfway through, could then just hold up the movie company for more. And when the movie company pointed to the contract, they could say, oh, it's unconscionable. Well, there wasn't a full and free negotiation. Genesis imposed their will and told him he had to sign this or we'll have to part ways. It was all imposed. It was all one-sided. What's the matter with parting ways? This guy is powerful. He carries the connections with him to the venture capital people. Well, and he loses millions of dollars in stock. I guess what I'm troubled with sort of globally by your argument is that every negotiation has a bottom line. Every party is going to come to a point where they say, look, I'm done negotiating. This is what I'm willing to do. And that seems to be inherent in almost every negotiation. Why is that a sign of unconscionability when there's a one-on-one face-to-face negotiation involved, not the baggage ticket? Well, that assumes that there's a one-on-one face-to-face negotiation, which is full and free. This was a second offer letter that was imposed on him. He sent two e-mails objecting to the non-equity clauses because it was already negotiated in the first offer letter. He objected. He objected. I told him, no, no. That's not a one-to-one negotiation. That's like an armed robber pulling a gun and said, let's negotiate. He had no bargaining power. I have a fountain pen. I have a gun. They're different. He had no bargaining power. And his mentor said in the Ninth Circuit, overwhelming bargaining power is oppression and procedural unconscionability. He had an agreement with no arbitration clause. Yes. If he had said, I'm not signing, the dispute would have been resolved in court, right? If he was a lawyer, he'd known that, yes. He was told he could not sign the first offer letter. He had to sign the second one. That's what he was told. Okay. Thank you, counsel. Thank you. Good morning. John Hirsch for Genesis Medical. I want to just briefly focus on what was the undisputed evidence, because that is really what we're talking about here. There is a dispute, and that is whether Mr. Semkin ever said anything about the arbitration clause in the course of the six-week negotiation before he signed the agreement with the arbitration clause. He had an offer letter, which he never signed, that gave him 8 percent equity that he could earn in the company and no arbitration. The new offer gave him a chance to get 9 percent, hundreds of thousands of dollars of additional money if he was able to work it out. The initial letter agreement, which it appears he never signed, what's the date of that? The date of that is November 11th, 2002. The negotiations about him requesting additional equity started in April of 2003. And between that time, there was performance on that agreement, wasn't there? He was paid. There was a board. Yes. I don't think there was any question that the company believed that those would be the terms of an agreement. What happened, and this is in the record, is that when an investor came in to invest and signed a term sheet, they were going through due diligence, which means getting all of the contracts in order. An investor he brought in? Well, actually, it was brought in by the entire company. No one brings in an investor on their own. This is a big East Coast company that went through several months of discussions before they came in. In due diligence, they were going to ask for a chance to look at the agreement, see if people were at will, see what their compensation was. You know, in the real estate business, there may be a lot of people who have something to do with bringing a ready, willing, and able buyer. But usually you're able to identify who that person is. And using that analogy, there's no doubt that he brought this investor, is there? I think there's some doubt because it required one person to make the contact, and he gets the credit for that. But it requires a team. It requires technology. It requires IP in order to sell them. So it's true. A real estate broker. Who brought the customer to the store? We'll give Mr. Semkin credit for that. That's why he was given 8 percent equity in the company. That's all I wanted to establish. Now, is your opponent correct that with the May 22, I have the date right? May 21st. May 21st exchange, Semkin had marked up the proposed agreement with things he was concerned about, including the arbitration clause? Is that accurate? No, that's not correct. What happened was the November 11th offer letter was supplemented by Genesis Council with additional terms that the company wanted to go along with the increased compensation terms. Let me try my question this way. Did your client ever receive a marked-up copy of the proposed agreement indicating Semkin's concerns, whether they agreed to them or not, that included the arbitration clause?  We gave him a revised November 11th letter that had a red-line version showing the additions. That red-line version is what showed underlining of the new terms, including the arbitration clause. Every new term was underlined. So your client's position is they never received any written, verbal, or inferential statement from Semkin that he objected to arbitration? That's correct, and that's what the declarations say. Okay. And the one thing I do want to point to is both the e-mail, which says if you don't like the new deal with 9 percent equity, we can sign the old deal, which has 8 percent equity and no arbitration clause. That's in an e-mail. It's in the record at page 87. And in the declaration of Mr. Manilow at page 26, he says, at one point in the negotiations, I told Semkin that if we could not reach agreement on the new contract, Semkin could simply stay with the old one. So he had the option of staying with the old one. He had the option of signing it and turning it in so the company's files would be The question here is, is there meaningful choice? He had meaningful choice. He opted for more stock compensation with an arbitration clause. What Mr. Semkin wants to do is he wants to take the Circuit City line of cases and say, I can negotiate for six weeks over the terms of a contract for a CEO that involved millions of dollars of compensation. Then on the last day, I can say, take out all the provisions I don't like because otherwise it's unconscionable. That is simply not the law. Thank you, counsel. The time was used up by the appellant in this case, so Semkin v. Genesis Medical was submitted. Your Honor, I would direct the Court's attention to page 167 and 172 of the appellate record. 167 is the e-mail from Kevin Semkin on May 27th that says, I finally got through redlining the revised offer letter. I am attaching it for your review. The attached e-mail in 172 underlines the arbitration agreement, so it says, I finally got through redlining the revised offer letter. The facts are that Kevin Semkin is the one who sent the redline to Genesis. Semkin v. Genesis Medical is submitted. Are counsel present now? We had a lawyer in two different courtrooms. Are counsel present now for Narendra Singh v. Gonzalez?
judges: Kleinfeld, Hawkins, Graber